**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TIMMY EUGENE WORKMAN,**

      **Plaintiff,**

v.                                     **Case No.: 2:16-cv-12503**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it seeks reversal and remand of the Commissioner's decision; that the Commissioner's motion to affirm the decision be

**DENIED;** that the decision be **REVERSED** and **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED** and **REMOVED** from the docket of the Court.

## I.    Procedural History

Timmy Eugene Workman ("Claimant") filed applications for DIB and SSI on December 6, 2013, alleging a disability onset date of June 11, 2007,[1] (Tr. at 13, 201-06), due to "[l]imited education, mental limitations, can not [*sic*] read or write, slow learner, can not [*sic*] remember things learned if able to learn, leg problems, knee problems, limited mobility due to leg and knee problems, has had left leg broken 3 times, depression [and] anxiety." (Tr. at 220). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 117-19, 126-28). Consequently, Claimant filed a request for an administrative hearing, (Tr. at 131), which was held on October 14, 2015 before the Honorable Toby Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 30-57). By written decision dated November 20, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-24). The ALJ's decision became the final decision of the Commissioner on November 1, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief seeking Judgment on the Pleadings in his favor. (ECF No. 14). In

---

[1] At the administrative hearing, Claimant elected to amend his alleged date of disability onset to December 8, 2013, which was well after his date last insured. As a result, Claimant no longer qualified for a period of disability and disability insurance benefits under Title II of the Social Security Act, and that application was dismissed. (Tr. at 13-14, 34).

response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Therefore, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 50 years old at the time of his initial application and 51 years old at the time of the ALJ's decision. (Tr. at 41, 204). Claimant left school after completing the eighth grade and communicates in English. (Tr. at 43, 219, 221). He previously worked as a general laborer and farm laborer. (Tr. at 53-54, 222).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the

4

degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since December 8, 2013, the amended alleged disability onset date. (Tr. 16, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "left knee deformity, status post left tibia fracture, degenerative arthritis, and borderline

intellectual functioning." (*Id.,* Finding No. 2). The ALJ considered Claimant's additional alleged impairments of numbness and weakness in the fingers of the right hand, depression, anxiety, and alcohol abuse, but found the conditions were not medically determinable impairments. (Tr. at 16-17*)*. Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or equaled any of the impairments contained in the Listing. (Tr. at 17-19, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 416.967(c). However, he can never kneel, crawl, or climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, crouch, and climb ramps and stairs. He can have no exposure to heights, moving machinery, or hazards. The claimant can have no more than frequent exposure to cold temperatures, wetness, and humidity. He would be afflicted with chronic pain noticeable to himself, but can maintain attention and concentration in two-hour increments with a normal morning break, lunch break, and afternoon break. The claimant is limited to simple, routine work with no production quotas or piecework. He can have only occasional contact with the public.

(Tr. at 19-22, Finding No. 4). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. 23, Finding, No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 23-24, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1963, and was fifty years old, defined as an individual closely approaching advanced age on the alleged disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant's past relevant work was unskilled. (Tr. at 23, Finding Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the

national economy; including unskilled, medium exertional level work as a cleaner, dishwasher or lumber sorter and in the unskilled light exertional level work as a floor worker, cleaner or hand trimmer. (Tr. at 23-24, Finding No. 9). Accordingly, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, from alleged onset through the date of the decision. (Tr. at 24, Finding No. 10).

## IV.  **Claimant's Challenges**

Claimant argues that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ committed reversible error by finding that Claimant did not meet Listing 12.05C, and (2) the ALJ's analysis of Claimant's pain and credibility was not in compliance with regulatory and case law. (ECF No. 14 at 2-21). Claimant contends that the ALJ improperly rejected a valid full scale IQ score, which demonstrated Claimant's intellectual disability, and misinterpreted the statements of a testifying psychologist, Dr. Marshall Tessnear. Claimant further asserts that he meets listing 12.05C; therefore, the Commissioner's decision should be reversed and remanded for an award of benefits. In addition, Claimant alleges that the ALJ's pain assessment and credibility finding did not comport with Social Security rules and regulations.

In response, the Commissioner argues that the ALJ correctly rejected the IQ score relied upon by Claimant, as its validity was called into doubt by Dr. Tessnear. Furthermore, the Commissioner points to other areas of the ALJ's decision in which he explained that Claimant failed to show deficits in adaptive functioning sufficient to meet the diagnostic description of Listing 12.05C. In regard to the ALJ's credibility and pain findings, the Commissioner argues that the ALJ provided a well-reasoned and thorough rationale for his findings, and his assessment fully complied with the SSA's regulations and Fourth Circuit jurisprudence.

## V.  Relevant Medical History

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence. The following summary, however, is limited to those entries most relevant to the issues in dispute.

### A.  Treatment Records

On April 2, 2005, Claimant presented to Braxton County Memorial Hospital with complaints of an old injury and left shoulder pain. (Tr. at 333). X-rays of his left shoulder revealed probable sclerosis at the distal end of the clavicle from an old injury with minimal hypertrophic bone formation. As the shoulder was not optimally visualized on two of the three images, the findings also may have been associated with degenerative changes.

On September 6, 2006, Claimant presented to Summersville Memorial Hospital with complaints of right shoulder and neck pain with no corresponding injury. (Tr. at 363). Claimant was examined, treated with Darvon and Flexeril, advised to take Tylenol, and released home.

Claimant returned to Summersville Memorial Hospital on July 23, 2007 with complaints of pain in both knees beginning seven months earlier and a "knot" on his forehead that Claimant reported was from an old bee sting. (Tr. at 358-60). Claimant's history was positive for smoking cigarettes and occasional use of alcohol. An x-ray of his pelvis showed normal findings with no fracture, dislocation, or bony abnormalities. (Tr. at 359). X-rays of his knees were also negative, with no fractures, dislocations, or significant bony abnormalities. (Tr. at 360). Two days later, Claimant returned to Summersville Memorial Hospital for examination of the knot on his forehead, which reportedly had gotten larger over the past several months. (Tr. at 361). Claimant's medical and surgical histories were unremarkable, as was his physical examination, with the

8

exception of the knot on his forehead. The examining physician diagnosed Claimant with cystic mass of the inferior portion of the forehead and recommended an excisional biopsy. (Tr. at 362).

Claimant presented to Summersville Memorial Hospital on November 14, 2007 for x-rays of his knees ordered by Dr. Miraflor Khorshad. (Tr. at 356-57). The x-ray results were negative, without obvious fractures, dislocations, or other significant bony abnormalities of either knee.

On August 2, 2012, Claimant went to Braxton County Memorial Hospital with complaints of left shoulder pain and decreased range of motion that began three days earlier. (Tr. at 331-32). Claimant was unsure, but indicated the pain could have resulted from of an injury sustained at his home. Claimant described the pain as severe, exacerbated by movement, and relieved by positioning. A review of systems was negative except for the shoulder symptoms. On examination, Claimant was alert and oriented with normal speech. His upper extremities were tender and had a limited range of motion, both active and passive. X-rays of Claimant's left shoulder were normal. The emergency room physician diagnosed Claimant with left shoulder strain and advised him to follow up with his physician for a possible MRI of the left shoulder. Claimant was discharged home in stable condition.

Two years later, on January 9, 2014, Claimant presented to Summersville Regional Medical Center for x-rays of his knees, tibiae, and fibulae as ordered by Fulvio Franyutti, M.D. (Tr. at 303-06). X-rays of the knees were negative for fractures, dislocations, or significant abnormalities. X-rays of the right tibia and fibula were negative for fractures or dislocations. The radiologist did not see any abnormal soft tissue calcifications, nor were any opaque foreign bodies seen. X-rays of the left tibia and fibula revealed extensive

chronic deformity of the distal left tibial shaft that appeared to be due to an old fracture; however, the fracture had healed, and there was no sign of any significant nonunion, new fracture, or dislocation.

On March 4, 2014, Claimant went to Braxton Community Health Center to establish primary care and was seen by Dr. Stephanie Frame. (Tr. at 335-37). Claimant complained of bilateral lower extremity weakness and swelling, ongoing for the past three years. He had no known associated injury, but reported that he had broken his left leg above the ankle on three prior occasions. Claimant told Dr. Frame that he began smoking cigarettes at age fifteen and had consumed alcohol for fifteen years, but had since stopped drinking. On examination, Claimant was alert and oriented. Dr. Frame described Claimant as "happy." Although Claimant ambulated normally, he had tenderness of both knees with evidence of mild swelling. X-rays of his knees showed no fractures, dislocations or other acute abnormalities, although minimal degenerative disease with peaking of the tibial spine was noted. (Tr. at 330, 339). Claimant was advised that his laboratory results were "good," but due to the initial findings on x-ray, additional imaging of his knees was required. Claimant returned to Braxton County Memorial Hospital six days later on March 10, for additional films of both knees. (Tr. at 338). The radiologist did not identify any fractures, osseous loose bodies, focal bone lesions, or evidence of joint effusion. Instead, minimal degenerative changes to the bilateral knees were seen. Dr. Frame contacted Claimant via telephone voicemail message to inform him that his x-ray showed arthritis of the knees. She offered to refer Claimant to an orthopedist if he wanted further evaluation.

On April 30, 2014, Claimant presented to Doyle R. Sickles, M.D., an orthopedic surgeon, on a referral from Dr. Frame to further evaluate Claimant's arthritic knees. (Tr.

at 340-42). Claimant reported that he limped "all the time," but did not take any arthritis medication, had not received physical therapy, and had not received any other medical treatment for his condition. Claimant reported that his legs felt tired with occasional discomfort in the thigh, but there was no numbness or pain in his hips or his back. Claimant described the pain as "needles sticking in the knees," with burning pain at night. He denied that his knee pain was related to activity, but felt it was worse in the daytime. Heat helped to lessen the pain. In addition, Claimant reported swelling behind the knees, as well as a frequent sensation of "giving way" when he stood or walked; however, he had no locking or catching sensation. Claimant's only current medication was Tylenol, taken as needed. On examination, Dr. Sickles found a mass in the dorsal first web space of Claimant's right hand, which was slightly tender to palpation. His range of motion was normal, and he could make a full fist. Claimant's hips were non-tender, with normal range of motion and 5/5 strength in all motor groups. Sensation was intact, and his hips were stable. Claimant's knees had normal alignment with no effusion, erythema, ecchymosis, or significant swelling. He had full flexion and extension of the knees and all of the ligaments were stable. Claimant's legs were unremarkable, with normal sensation, good perfusion distally, equal leg length, and intact strength of the quadriceps and hamstrings. Dr. Sickles reviewed x-rays of Claimant's knees taken in March 2014 and confirmed negative results. Dr. Sickles diagnosed Claimant with chronic pain and effusion of the knees and a mass of the right hand. Dr. Sickles ordered an x-ray of Claimant's hand and discussed the need for an MRI of the hand to evaluate the mass. After obtaining those results, Dr. Sickles would discuss treatment options with Claimant.

On July 3, 2014, Claimant returned to Braxton Community Health Center with complaints of bilateral knee pain and two "knots" on the bottom of the left foot. (Tr. at

343-46). Claimant reported that he had been examined by an orthopedist who advised him to walk with the use of a cane, so he was using a cane at the visit. Claimant described having pain in his left foot for the past two weeks with soreness between the lateral toes and on the bottom of the foot. Claimant was referred to a podiatrist for further treatment.

Claimant presented to Braxton County Memorial Hospital on June 11, 2015 complaining of back pain beginning four days earlier with no known accompanying injury. (Tr. at 348-51). He described his back pain as sharp and unrelenting. The pain was exacerbated with flexion and included flank pain, which radiated around to the right lower quadrant. On examination, Claimant's back showed evidence of muscle spasm and decreased range of motion. His extremities were non-tender with normal range of motion and no pedal edema. On neurological examination, Claimant was alert and oriented with no apparent motor or sensory deficit, and he walked with a normal gait. Claimant was assessed with low back pain and lumbar myofascial strain. He was treated with Toradol, Decadron, and Norflex; provided a prescription for Vicoprofen and Robaxin; and discharged in stable condition.

### B. Evaluations and Opinions

On January 9, 2014, Miraflor G. Khorshad, M.D., examined Claimant at the request of the West Virginia Social Security Disability Determination Division. (Tr. at 316-20). Claimant alleged limited education, leg and knee problems, limited mobility, depression, and anxiety. Claimant complained of bilateral leg pain along with swelling in the backs of his legs. Claimant also informed Dr. Khorshad that he had trouble reading, writing, climbing steps, and walking—if it involved any length of time. A review of systems was positive for chronic fatigue, decreased range of motion of the neck, chest pain, wheezing, coughing, and shortness of breath. Claimant appeared to be his stated age of

50 years, measured five feet four inches tall, and weighed one hundred forty pounds. He was alert and oriented with intact reflexes. Claimant walked with a normal gait; did not require the use any assistive device; and could independently get on and off the examining table. In addition, Claimant was able to do the heel/toe maneuver, sit, and squat. He had no joint swelling or effusion, leg or pedal edema, and the muscle strength of both the upper and lower extremities was 4/5. His straight leg raising test was negative, both when supine and when seated. Dr. Khorshad noted a bony deformity of the tibia on the right lower leg. Claimant's right leg measured 91 centimeters, and his left leg measured 87 centimeters. Flexion and extension of the knees measured 15 degrees. Range of motion of the bilateral shoulders measured 18 degrees flexion and abduction, and 50 degrees adduction. Claimant informed Dr. Khorshad that he had experienced bilateral knee pain for the past four years with some swelling of the right knee. Claimant explained that on three prior occasions, while wrestling, he had sustained a fracture of his left tibia. Claimant reported that a physician had advised him to wear a shoe lift in his left shoe due to leg length discrepancy. Dr. Khorshad also examined Claimant's upper extremities, documenting a coarse tremor of both hands. Claimant's hands had bony deformities of the DIP joints, and his right hand had a soft, movable lump on the fifth intertriginous space that could represent a ganglion cyst. Claimant had clubbing of his fingernails, with nicotine stains noted on the right second and third digits. Claimant could extend his hands, make a fist, and oppose his fingers. Fine manipulation of the left hand was normal; however, Claimant's right hand was impaired. Dr. Khorshad diagnosed Claimant with degenerative arthritis of both hands and knees, left leg length discrepancy, and illiteracy.

On January 24, 2014, Narendra Parikshak, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 64-66). Dr. Parikshak found that Claimant could

lift and/or carry fifty pounds occasionally; lift and/or carry twenty-five pounds frequently; stand, walk or sit six hours, each, in an eight hour work day; and had no limitations on pushing or pulling other than those limitations assigned for lift and/or carry activities. Claimant could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but could only occasionally climb ladders, ropes, or scaffolds. Claimant did not have any manipulative, visual, or communicative limitations. As for environmental limitations, Claimant could have unlimited exposure to extreme heat, noise, vibrations, fumes, odors, dusts, gases and poor ventilation, but needed to avoid extreme cold, wetness, humidity and hazards, such as machinery and heights. On April 11, 2014, Fulvio Franyutti, M.D., reviewed the medical evidence considered by Dr. Parikshak, as well as new medical records. Dr. Franyutti affirmed Dr. Parikshak's assessment as written. (Tr. at 90-92).

On February 3, 2014, Larry J. Legg, M.A., completed a Neuropsychological Evaluation at the request of the West Virginia Disability Determination Service. (Tr. at 321-26). Mr. Legg noted that Claimant was cooperative and serious, displayed average posture, and walked with a slight limp. He appeared on time for the evaluation, having been brought by his father. Claimant told Mr. Legg that he lived with his parents. When asked about his educational background, Claimant reported completing eighth grade and "guessed [he] was in special education," because he was placed in a reading/writing lab. He left school because "[he] couldn't get along with the other kids." Claimant denied being diagnosed with mental retardation. As for physical complaints, Claimant reported leg and knee pain that caused swelling and problems walking. Claimant indicated he wore knee braces periodically to help ease some of his symptoms. He did not take any prescription medications, nor did he have a family physician. When asked about his allegations of

depression and anxiety, Claimant indicated that he did not know what anxiety was, but he did not sleep well and sometimes shaked.

On mental status examination, Claimant was oriented in all four spheres, spoke with a normal tone, was motivated, cooperative, and polite. His mood appeared dysphoric, and his affect was flat. Claimant demonstrated normal thought processes, content, psychomotor behavior, and judgment. Claimant also demonstrated recent, remote, and immediate memory that was within normal limits. Although Claimant was found to have persistence within normal limits, his concentration and pace were mildly deficient. Claimant was also mildly deficient in social functioning. He reported he had several friends, got along well with his family, and went out of the home approximately every two weeks to "go into town and back;" however, his only enjoyable activity involved watching television. Claimant's daily routine and activities included eating three meals a day, watching television, taking a short walk in the afternoon, and helping his parents with household chores.

A Neurobehavioral Cognitive Status Examination, ("COGNISTAT"), was administered to Claimant and returned valid scores. Claimant scored average in the categories of orientation, attention, comprehension, repetitions, naming, memory and judgment, but was mildly limited in calculations and moderately limited in similarities and constructions. Mr. Legg opined that Claimant's limitations seen on COGNISTAT were chronic, explaining that his poor performance in those areas was probably not a function of newly acquired disabilities, but rather, reflected long-standing learning disabilities.

In addition, Claimant took the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). He received scores of 66 in verbal comprehension, 63 in perceptual reasoning, 80 in working memory, 68 in processing speed, and a measured full scale IQ

of 63. Claimant's test scores were considered valid and found generally consistent with his self-reported education and vocational background. Claimant's IQ score placed him in the extremely low range of general intellectual functioning; however, as Claimant had never received a diagnosis of mental retardation, Mr. Legg diagnosed Claimant with borderline intellectual functioning. Mr. Legg viewed Claimant's prognosis as fair and found him capable of managing his own finances.

On February 11, 2014, Dr. Joseph Richard completed a Psychiatric Review Technique ("PRT"), comparing Claimant's mental impairment to Listing 12.02 (organic mental disorders). (Tr. at 63-64). Dr. Richard did not feel that Claimant met the criteria of the listing. He opined that Claimant was mildly limited in activities of daily living and moderately limited in maintaining social function, concentration, persistence, and pace. Claimant had no documented episodes of decompensation of extended duration, and the evidence did not establish the presence of paragraph "C" criteria. Dr. Richard found Claimant only partially credible, explaining that the medical records did not support the extent of limitation alleged by Claimant.

Dr. Richard also completed a Mental Residual Functional Capacity Assessment on February 11, 2014. (Tr. at 66-68). Dr. Richard opined that Claimant was not significantly limited in his ability to remember locations and work-like procedures or understand and remember very short and simple instructions; however, Claimant was moderately limited in his ability to understand and remember detailed instructions. Dr. Richard felt that Claimant was not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; and work in coordination with or in proximity to others without being

distracted by them. In contrast, he was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without unreasonably long or frequent rest periods. Although Claimant was moderately limited in his ability to interact appropriately with the general public, he was not significantly limited in his ability to ask simple questions or request assistance; accept instructions; respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Dr. Richard did not believe Claimant had any adaptation limitations. He thought that Claimant's statements appeared reasonably consistent with the medical evidence. Based on his review of the records and the consultative examination findings, Dr. Richard concluded that Claimant had the residual functional capacity to complete work-like activity in a low stress work environment performing simple, routine tasks that did not carry any production requirement and included minimal contact with the public and accommodation for Claimant's physical limitations.

On April 7, 2014, Joseph A. Shaver, Ed.D, reviewed the case file, including new medical records, and affirmed Dr. Richard's PRT and RFC assessment as written. (Tr. at 89-90, 92-94).

### C.  Claimant's Statements and School Records

In his adult disability report, which was completed for him by his nephew, Claimant stated that he was illiterate, was a slow learner, had mental limitations, had a limited education, and quit school after the eighth grade. (Tr. at 219-20). Claimant

reported taking special education classes in all eight grades. (Tr. at 221). He worked most of his life in general laborer positions, but could not recall the details of any of his prior jobs. (Tr. at 225). A notation on the disability report indicates that Claimant's nephew provided the information included on the form, because the questions confused Claimant.

On a third-party ADL form completed by Daris Criss, Claimant's nephew, Mr. Criss indicated that Claimant had to be reminded to take care of his personal needs and grooming. (Tr. at 231-38). He lived with his family, and family members cooked for him and helped him with chores. Claimant did not have a driver's license, but could ride along in the car. Mr. Criss stated that Claimant was not able to manage money and spent most of his day watching television. When Claimant went out, he needed to be accompanied by someone. (*Id.*). According to Mr. Criss, Claimant did not follow written or oral instructions well and did not easily adjust to changes in routine.

Claimant reiterated in an adult function report—again prepared with the assistance of Mr. Criss—that he lived with his family, spent most of the day watching television, and relied on his family for help with activities of daily living such as chores and cooking. (Tr. at 268-75). Claimant reported that he was previously fired or laid off from a job, because of his inability to get along with his supervisor. He also started using a cane and hearing aids to walk and read, although neither were prescribed by a physician. Claimant denied being able to pay bills, count change, handle a savings account, or use a checkbook.

At the administrative hearing held on October 14, 2015, Claimant testified that he lived with his mother and father and had lived with them his entire life. (Tr. at 42, 52). Claimant had never been married and had no children. (Tr. at 52). He did not have a current driver's license, because he did not need one, but he had one in the past. Claimant

18

explained that he could not pass the written test, but did pass an oral examination on the sixth or seventh try. (Tr. at 52). Claimant confirmed that he completed the eighth grade, but could not read or write well and had trouble performing simple arithmetic. (Tr. at 43). He stated that he was unable to read or write a grocery list, although he could write his name. He testified that he quit working, because of arthritis in his back and legs. (Tr. at 44). Prior to that, he worked side-by-side with his sister, who helped Claimant perform his job duties. (Tr. at 50-51). Claimant testified that he sometimes had trouble understanding what was being asked of him and relied on co-workers for assistance.

Claimant also submitted his educational records from the Nicholas County Public Schools, covering first grade through eighth grade. (Tr. at 298-99). Claimant did not receive letter grades; instead, his school performance was largely evaluated as either less than satisfactory, satisfactory, or more than satisfactory. (Tr. at 299). In his final year, Claimant received less than satisfactory marks in all classes except writing, art, and physical education. The records also included scores from various educational examinations taken by Claimant over the years. Unfortunately, a key does not accompany the results, so their meaning is not entirely clear. However, the composite scores of the STS Educational Development Series examination taken by Claimant in the sixth grade reflect that he was functioning below grade level. (*Id.*). Although Claimant has repeatedly stated that he was enrolled in special education courses, the school records neither confirm nor refute that statement.

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v.

19

Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  **Discussion**

### A.  **Listing 12.05C**

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20

C.F.R. § 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). "For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which in 2015 were arranged in nine diagnostic categories, including Listing 12.05 (Intellectual Disability). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* Thus, to meet or equal Listing 12.05C, Claimant must demonstrate that he has an intellectual impairment that satisfies both the *diagnostic description* of intellectual disability and the *severity criteria* set forth in paragraph C. The diagnostic description of intellectual disability, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which are the next two prongs of the listing, include:

(1) "a valid verbal, performance, or full scale IQ of 60 through 70" and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

In his first challenge, Claimant argues that the ALJ's analysis of Claimant's intellectual impairment under Listing 12.05C contained two errors, and these errors resulted in the ALJ incorrectly deciding that Claimant did not meet the listing. First, Claimant contends that the ALJ improperly rejected Claimant's valid full scale IQ score, which was 63, falling well within the range of the second prong of the listing. Second, Claimant asserts that the ALJ's assessment of Claimant's deficits in adaptive functioning was incomplete and inaccurate. Claimant points to various functional deficits that the ALJ should have considered when reaching his decision that Claimant failed to meet the diagnostic description of intellectual disability.

As stated, Claimant must meet or equal all three prongs to satisfy the requirements of the listing. For that reason, even if the ALJ erred in making one of the two findings challenged by Claimant, as long as the ALJ's reasoning on the other finding is supported by substantial evidence, the decision need not be reversed and remanded. *See Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012) ("As previously noted, Hancock can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2. Therefore, even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence."); *Dearry v. Astrue*, No. 2:11CV00027, 2012 WL 1165332, at *5 (W.D. Va. Apr. 9, 2012) ("The plain language of the regulation provides that to satisfy the listing requirements, an impairment must meet *both* the introductory requirement *and* the additional requirements outlined in the particular

sections [...] The key question in this case is whether the evidence shows that Dearry has had deficits in adaptive functioning manifesting before the age of 22.") (collecting cases). Therefore, the undersigned will look at the evidence and the analysis of all three prongs of Listing 12.05C, taking them in reverse order.

Looking first at the third prong, the parties do not disagree that Claimant has a physical impairment "imposing an additional and significant work-related limitation of function." Although the regulations do not define the term "significant," the Introduction to Section 12.00 explains that an additional impairment will satisfy this requirement if it significantly limits the claimant's ability to do basic work activities, "i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00 (A). Here, the ALJ found that Claimant's left knee deformity and degenerative arthritis were severe impairments that significantly limited his ability to perform basic work activities. Therefore, Claimant fulfills the third prong of Listing 12.05C.

With respect to the second prong, Claimant must produce a valid verbal, performance, or full scale IQ score between 60 and 70. In the introduction to Section 12.00, the SSA states that "[s]tandardized intelligence tests results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00 (D) (6). However, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* Furthermore, when "considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the

individual's customary behavior and daily activities." *Id.* In general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, but the ALJ is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); *see also Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The ALJ may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions, or other evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ. *Clark*, 141 F.3d at 1255; *see also Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986). The question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Pogue v. Astrue,* 692 F. Supp.2d. 1088, 1100 (E.D. Mo. 2010).

On February 3, 2014, Claimant was administered the WAIS-IV by Lisa Deel, M.A., and the test results were interpreted by Ms. Deel and Larry Legg, M.A., a licensed psychologist. (Tr. at 321, 323-24). Claimant received a full scale IQ score of 63, placing him in the first percentile of individuals having taken the test. Mr. Legg opined that the test results were valid based upon reports that Claimant put forth sufficient effort, was motivated and cooperative, and showed no signs of intoxication or malingering. (Tr. at

24

324). Mr. Legg indicated that the results reflected an "extremely low range of general intellectual functioning." (*Id.*).

The ALJ acknowledged that Claimant's full scale IQ score "seem[ed] to satisfy the IQ criteria" of Listing 12.05C's second prong, but rejected its validity nonetheless. (Tr. at 19). The ALJ explained that the IQ score was "somewhat questionable" when compared to Claimant's school record. By way of explanation, the ALJ relied on testimony offered by Dr. Tessnear at the administrative hearing in which Dr. Tessnear opined that the IQ score was inconsistent with results Claimant received on an STS Educational Development Series examination taken in 1976 when Claimant was twelve years old and in the sixth grade. In his testimony, Dr. Tessnear confirmed that Claimant's February 2014 IQ score fell within the severity criteria of Listing 12.05C, but added that Claimant's STS scores "were slightly higher than you would expect someone ... basically what we have there are stanines for ability testing. You see a lot of twos and threes in there. That ... that would be slightly higher than ... than an IQ of 70 ... that would make 12.05C listing a little more questionable." (Tr. at 36-37).

While the ALJ acted within his authority to reject Claimant's 2014 IQ score, the undersigned **FINDS** that his decision to do so was not supported by substantial evidence. Mr. Legg vouched the validity of the IQ score, setting forth several legitimate grounds for believing in its accuracy. Most importantly, Mr. Legg opined that Claimant's full scale IQ score "was consistent with claimant's self-reported educational and vocational background." (Tr. at 324). Consequently, the results should have been given considerable weight unless there was other *substantial* evidence in the record to undermine the reliability of the score. The ALJ provided only one piece of evidence as grounds for rejecting the score: Claimant's school record as interpreted by Dr. Tessnear; in particular,

25

his interpretation of the stanines on a sixth grade educational test. For the following reasons, neither the school record, nor the testimony given by Dr. Tessnear, and adopted by the ALJ, constitute substantial evidence, or provide a legitimate reason for rejecting Claimant's valid full scale IQ score.

First, the school records, which do not contain any letter grades or percentages, are not particularly revealing as to Claimant's level of functioning. No key is provided to decipher what standards of performance merited the "grades" of satisfactory, satisfactory plus, and less than satisfactory. Similarly, no key accompanies the educational tests that were administered to Claimant between 1971 and 1978, and no information is provided regarding the qualifications of the individuals that administered the tests. No comments are given regarding the validity of the test results, how they reflected Claimant's level of functioning, or how they compared to standardized intelligence testing.

Dr. Tessnear finds that Claimant's stanines (or standard nines) were indicative of an IQ greater than 70; however, he provides no explanation or factual support for that conclusion. The stanines used by the Nicholas County Schools were "local stanines." (Tr. at 299). Whether Claimant's performance was compared to that of other children in his class at school, the county, or the State of West Virginia is unclear, but certainly would impact the legitimacy of conclusions based upon a comparison of the stanine results with nationwide, standardized IQ tests.

Finally, even if the scores obtained by Claimant on educational testing performed in the sixth grade could be interpreted to reflect his IQ at that time, the results are not reliable. Both the Social Security regulations and the Commissioner's Program Operations Manual System ("POMS") recognize that IQ test results obtained from children younger than age 16 are not always consistent over time. 20 C.F.R. pt. 404,

subpt. P, app. 1, § 112.00D(10) (eff. Aug. 12, 2015—May 23, 2016); POMS § DI 24515.055A.[2] According to the regulations, "a child's IQ score tends to stabilize by the age of 16; therefore IQ test results obtained before 16 are considered current for only two years when the IQ score is above 40." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(10). Claimant was twelve years old when he took the STS Educational Development Series interpreted by Dr. Tessnear as showing an IQ in excess of 70. As such, the results were only current until Claimant was 14 years of age. Therefore, when applying the SSA's own guidelines, the ALJ should not have given Claimant's educational testing results more evidentiary weight than the IQ testing performed and verified as valid by Mr. Legg.

The Commissioner argues that the ALJ properly relied on expert opinions by Dr. Tessnear and Mr. Legg in finding that Claimant had borderline intellectual functioning, rather than intellectual disability. While the Commissioner makes a valid point that these medical source opinions should be considered and weighed for their evidentiary value, the ALJ failed to acknowledge and resolve inconsistencies in the opinions that undermined their weight. Mr. Legg determined that Claimant did not have intellectual disability despite a full scale IQ score well within that range. The explicit, and sole, reason

---

[2] POMS § DI 24515A states in relevant part:

> The specific test administered should be reliable (yield repeatable results), valid (be an accurate measure of what is meant by intellectual ability or intelligence), and be standardized according to accepted psychometric practice and have normative data relating to a recent cross-section of the general population. ... If a file contains the results of several versions of the same test, such factor as currency of the evaluation, claimant's age at time of evaluation, adequacy of claimant and evaluator motivation, and completeness of the administration and report must also be weighed in the decision as to which of several IQ's from different revisions of the same measure will be determinative. ... Test results obtained at younger ages are less reliable and valid than test results obtained at older ages. Results obtained below the age of 6 are particularly suspect. ... While there is obviously no specific age at which test results suddenly become "valid" (i.e., accurate and stable indices of the subject's abilities), IQ's obtained from tests having the desirable qualities described above tend to stabilize by the age of 16.

Mr. Legg gave for ignoring what he felt was otherwise "a valid measure of [Claimant's] current level of intellectual functioning," was the fact that Claimant had never been diagnosed with mental retardation. As Dr. Tessnear intimated at the administrative hearing, Mr. Legg's reason for rejecting the diagnosis of intellectual disability in favor of borderline intellectual functioning was simply not valid. Notwithstanding Dr. Tessnear's testimony, which was given "great weight" by the ALJ, the ALJ simply adopted Mr. Legg's debatable diagnosis without resolving the underlying conflict. Moreover, the ALJ never addressed a separate significant mistake in Dr. Tessnear's testimony that should have given the ALJ some pause. Dr. Tessnear misstated the criteria of Listing 12.05C, testifying that Claimant could not meet the listing, because there was no evidence that he had "an additional mental impairment." (Tr. at 36). Dr. Tessnear plainly failed to consider that Claimant could meet the third prong of Listing 12.05C with a *physical* impairment; in fact, that was the case with Claimant. How much Dr. Tessnear's mistake influenced the ALJ's step three finding is unknown, but the obvious, uncorrected error is troubling nonetheless.

As previously indicated, even though the ALJ erred by rejecting a valid IQ score based solely on Dr. Tessnear's dubious interpretation of a childhood educational test, the Commissioner's decision need not be reversed if the ALJ's finding regarding Claimant's adaptive functioning is supported by substantial evidence. "Adaptive functioning refers to more than simply an IQ score or grades in school." *Dearry*, 2012 WL 1165332, at *5; *Salmons v. Astrue*, No. 5:10CV195-RLV, 2012 WL 1884485, at *2 (W.D.N.C. May 23, 2012). According to the American Psychiatric Association:

> Deficits in adaptive functioning ... refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background.

> Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed. 2013) at pg. 37.[3] "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia,* 536 U.S. 304, 309 n. 3 (2002)); *Hinkle v. Comm'r Of Soc. Sec.*, No. 3:14-CV-41, 2015 WL 2170034, at *6 (N.D.W. Va. May 8, 2015). Because intellectual disability is a lifelong condition, a claimant must show that the deficits in adaptive functioning manifested during the formative years, predating age twenty-two. *Herron v. Astrue*, No. 5:12-CV-44, 2012 WL 4747270, at *9 (N.D.W. Va. Aug. 24, 2012) (citing *Luckey v. U.S. Dept. of Health and Human Svcs.,* 890 F.2d 666, 668 (4th Cir. 1989)).

As many courts have recognized, Listing 12.05C "does not expressly define 'deficits in adaptive functioning.'" *Rothrock v. Colvin*, No. 1:13CV497, 2016 WL 1175189, at *6

---

[3] The SSA recognizes four major professional organizations that each has its own definition of intellectual disability. All four definitions include significant deficits in adaptive functioning as an element of the condition although the organizations differ in the required date of onset and the method of measurement. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association's definition, while not specifically adopted by the SSA, is generally accepted and recognized in the field of mental health.

(M.D.N.C. Mar. 23, 2016). Whether a claimant's adaptive deficits fulfill the diagnostic description contained in the first prong of the listing is "a fact-specific inquiry and must be determined on a case-by-case basis." *Odoms v. Colvin*, 194 F.Supp.3d 415, 422–23 (W.D.N.C. 2016) (citation omitted). Although this inquiry has "few bright line rules," courts in this circuit have pointed to multiple factors that tend to establish the presence of deficits in adaptive functioning with an early onset. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases). For example, if a claimant has previously been diagnosed with mental retardation, courts are inclined to find that the claimant had an earlier onset of deficits in adaptive functioning. *Conyers v. Astrue,* No. 4:11–CV–00037–D, 2012 WL 3282329, at *8-9 (E.D.N.C. June 29, 2012). In addition, evidence of a claimant's illiteracy, *Rivers v. Astrue,* No. 8:10–cv–314–RMG, 2011 WL 2581447, at *4 (D.S.C. June 28, 2011); evidence that a claimant has never lived independently, *Holtsclaw v. Astrue,* No. 1:10CV199, 2011 WL 6935499, at *5 (W.D.N.C. Dec.30, 2011); and evidence that a claimant is dependent on others, or has never been responsible to care for others, *Salmons v. Astrue,* No. 5:10-CV-195–RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012), have all been considered proof of deficits in adaptive functioning that manifested before age 22.

Another well-recognized indicator of limitations in adaptive functioning manifesting in the developmental years is poor academic performance. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23. 2012) ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22.") Accordingly, school records showing ongoing problems in the classroom are important evidence of early-onset deficiencies in functioning that should not be undervalued when assessing the

diagnostic description of intellectual disability. In addition, work history is a factor to consider, as absent or unstable job performance may indicate deficits in adaptive functioning; although, the existence of a stable work history, by itself, is not determinative of the inquiry. *See Salmons,* 2012 WL 1884485, at *2-3 (citing *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989)); *see Cook v. Colvin*, No. 2:13-CV-20573, 2015 WL 627856, at *16 (S.D.W. Va. Feb. 9, 2015) ("[W]ork history is one factor to examine when looking for deficits in adaptive functioning that manifested in the developmental period [...] Not only is the type of work performed by Claimant important, but his work record in general should be examined."); *Hancock,* 667 F.3d at 475–76 (The ALJ's consideration that Claimant worked several jobs, in addition to performing a variety of tasks, was sufficient evidence to support the ALJ's finding that the claimant did not have deficits in adaptive functioning; *Richardson v. Colvin,* No. 8:12–cv–3507–JDA, 2014 WL 793069, at *12 (D.S.C. Feb. 25, 2014) ("[W]ork history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, ... can be relevant in determining whether a claimant manifested deficits in adaptive functioning").

The ALJ determined that Claimant did not meet the first prong of Listing 12.05C, because "the record does not include necessary evidence of deficits in adaptive functioning" and provided the following explanation:

> Although the claimant has not worked in several years, he indicated that he stopped working because of problems with his leg (Exhibit 2E). Therefore, it would seem he was otherwise successful in performing the required job duties. He reported to Mr. Legg that he assisted with household chores (Exhibit 4F), and in his hearing testimony he indicated he had a driver's license at one time.

(Tr. at 19). At other places in the decision, the ALJ considered how well Claimant coped

with common life demands. For example, the ALJ found Claimant to have only mild restrictions in performing personal care tasks and noted that Claimant got along well with family, friends, and neighbors and had normal memory and persistence. (Tr. at 18). The ALJ also emphasized that Claimant had been diagnosed by Dr. Legg with borderline intellectual functioning, rather than intellectual disability, and seemed to perform better in elementary school than was reflected by his IQ scores.

Although the ALJ properly considered some of the evidence relating to Claimant's adaptive functioning, he overlooked, or at least failed to discuss, other significant evidence that contradicted his determination. Certainly, an ALJ need not discuss every piece of evidence in the record. Nevertheless, "[s]ince it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, ... an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 384 (4th Cir. 1994) (quoting *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981). The duty to explain and resolve evidentiary conflicts is intrinsic to a social security disability determination, and is particularly necessary when "inconsistent evidence abounds," because without the resolution and explanation, the reviewing court is left to wonder in such a way that it "cannot conduct 'meaningful review.'" *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (quoting *Mascio v. Colvin,* 780 F.3d 632, 638 (4th Cir. 2015)).

Contrary to the ALJ's statement that the record lacked necessary evidence of deficits in adaptive functioning, the record is replete with evidence suggesting Claimant's inability to cope with the common challenges of life. Starting with his educational history, Claimant's marks at school confirm that he did not perform well, receiving predominantly

"satisfactory minus" scores in his final year. (Tr. at 299). Moreover, Claimant dropped out of school before the ninth grade, stating that he had difficulties getting along with the other children. (Tr. at 322). Although not corroborated by the school record produced, Claimant reported that he was in special education classes and never learned to read or write well. (Tr. at 43, 50, 219, 221, 278, 322). Indeed, one examining physician, Dr. Khorshad, diagnosed Claimant as being illiterate. (Tr. at 318). At the administrative hearing, Claimant was unable to perform any more than rudimentary arithmetic when questioned by the ALJ, (Tr. at 44), and he and his nephew repeatedly confirmed that Claimant could not manage money, pay bills, count change, handle a savings account, or use checks. (Tr. at 43, 234, 251, 271). Claimant's nephew had to prepare all of his social security filings for him, in part because Claimant was confused by the questions. (Tr. at 45-46, 218, 225, 230, 267, 275).

As to his home life, Claimant lived with his parents his entire life and relied on his family members to feed him, remind him to bathe, and accompany him when he left the house. (Tr. at 52, 233, 235, 250, 251, 252, 270, 271, 278, 321). Claimant was never responsible for another human being; he never married; he had no children; and  family had to help him care for his pets. (Tr. at 52, 232, 269). While he claimed to have received a driver's license at some point in the past, he testified that it took him six or seven attempts before he passed an oral examination. (Tr. at 52). Furthermore, at the time of the administrative hearing, Claimant had not possessed a valid driver's license for some time, did not drive, and relied entirely upon others for transportation. (Tr. at 42, 321)

As to Claimant's work history, which was a major factor in the ALJ's determination that Claimant did not meet the diagnostic description of intellectual disability, the ALJ failed to acknowledge and address important evidence that cast doubt on his conclusion.

When examining the evidence related to Claimant's work history, not only was his work record important, but the type and skill level of work he performed, and his ability to complete all of his job duties, should have been considered. *See Weedon v. Astrue,* No. 11–2971–DCN–PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013) (Claimant's past ability to perform skilled or semi-skilled work is evidence that he lacks deficits in adaptive functioning). Here, the uncontroverted evidence is that Claimant last worked as a laborer at 3M side-by-side with his sister. (Tr. at 50-51). When he had trouble understanding what was expected of him, his sister was there to help him. She even performed some of his job duties for him. (*Id.*). Prior to his position with 3M, Claimant provided unskilled labor to various business, including work as a farm laborer, although Claimant could not remember his job duties or rates of pay. (Tr. at 222, 225, 247, 317). As was the case at 3M, at Claimant's other jobs, he relied on co-workers to help him complete basic work activities. (Tr. at 51-52). Claimant admitted to having trouble following written and oral instructions, and he was unable to cope well with stress or changes in routine. (Tr. at 236-37, 253-54).

Significantly, the ALJ should have considered that Listing 12.05C presumes that most intellectually disabled individuals with IQ scores in the range of 60-70 are capable of working. *Mebane v. Colvin*, No. 2:13–CV–43–FL, 2014 WL 3510208, at *7 (E.D.N.C., July 15, 2014). However, the listing further recognizes that the addition of a mental or physical impairment imposing a significant work-related limitation of function, on top of the intellectual deficit, will often disable these individuals. "Therefore, the fact that [a intellectually disabled claimant] has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments." *Id.* (citing *Radford v. Astrue,* No. 5:08–CV–421–FL,

2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009)). Work history "can be of limited relevance" in the case of an individual with intellectual disability "if it precedes the development of additional severe impairments." *Id.* at 6.

In sum, the ALJ failed to acknowledge and weigh all of the significant evidence, which would have allowed him to explicitly reconcile the apparent inconsistencies. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (recognizing that ALJ should "explicitly indicate[ ] the weight given to all of the relevant evidence."). He also relied upon consultative opinions that were inaccurate in significant ways or lacked substantial support. Lastly, he failed to explain his final determination on Listing 12.05C in sufficient detail for the reviewing court to conclude that the ALJ performed an adequate and legally sound analysis. Given that a proper evaluation of evidence could reasonably alter the outcome of the disability determination, the ALJ's errors were not harmless. Accordingly, the undersigned **FINDS** that the case should be reversed and remanded so that an assessment of all of the significant evidence pertaining to Claimant's intellectual impairment can be compared to the criteria of Listing 12.05C. The undersigned notes Claimant's request that the case be remanded for an award of benefits, but declines to recommend that option. As explained above, additional analysis of the evidence is required. As the Court is precluded from performing that task, reversal and remand for further consideration by the ALJ is the most appropriate course. *See Fox,* 632 F.App'x at 754 (4th Cir. 2015) (quoting *Radford,* 734 F.3d at 296) (finding that it is not "the province of the district court" to engage in the fact-finding and analytical tasks that should have been performed by the ALJ in the first instance.).

### B. ALJ's Assessment of Pain and Credibility

In light of the undersigned's above recommendation that this case be reversed and

remanded, a detailed discussion of the ALJ's pain and credibility assessment is unnecessary. Nevertheless, the undersigned has considered the explanation provided by the ALJ for finding that Claimant's statements regarding the extent and severity of his pain were less than fully credible and **FINDS** no error in the ALJ's pain and credibility assessment. The ALJ did not suggest that Claimant has *no* pain; instead, the ALJ did not accept Claimant's contention that the pain in his knees prevented him from engaging in any competitive work activity. (Tr. at 21).

The ALJ reviewed the objective medical evidence, as required, and noted that the medical imaging did not show significant abnormalities. (Tr. at 20). While Claimant had documented degenerative changes, described as "very minimal," (Tr. at 328), he displayed a full range of motion in both knees, without effusion, erythema, or significant swelling. At an examination by Dr. Sickles, Claimant complained of chronic knee pain, but had no associated physical signs, and took no medications for arthritis. Claimant's muscle strength, range of motion, ligaments, sensations, and vascular perfusion were all normal. After the examination, Dr. Sickles diagnosed Claimant with chronic knee pain, but made no recommendations for treatment. At his consultative examination with Dr. Khorshad, Claimant walked with a normal gait, did not use assistive devices, was able to get on and off the examination table, could do heel/toe maneuvers, and could sit and squat.

In addition to the objective medical findings, the ALJ pointed to certain statements and actions by Claimant that the ALJ felt were inconsistent with Claimant experiencing disabling knee pain. First, Claimant told Dr. Sickles that activity did not exacerbate his knee pain. (Tr. at 20). He also denied having hip and back pain. In addition, although Claimant alleged a disability onset date of August 2013, he did not

seek any treatment for his knee pain until March 2014, nearly seven months later. (Tr. at 20-21). While the ALJ recognized that Claimant did not have insurance and may not have sought regular treatment for that reason, the ALJ logically surmised that if Claimant truly had disabling knee pain, he would have gone to a free clinic or emergency room for care. Claimant's argument that the ALJ placed too great of expectations on an individual with Claimant's intellectual and cognitive deficiencies is unavailing. The social security filings made on Claimant's behalf uniformly demonstrate that Claimant's family members provided him with a solid network of support and assistance. Indeed, Claimant sought care for his knees twice in 2007. Thus, to suggest that Claimant would not have been able to seek medical care if he really needed it is not only speculative, but is contrary to the evidence.

The ALJ also considered Claimant's daily activities, accepting that they were relatively limited. However, the ALJ pointed out that Claimant reported taking afternoon walks. (Tr. at 21). The ALJ reasonably concluded that Claimant's ability to take walks suggested that his knee pain was not so unbearable that he was precluded from activities that required some walking. Finally, the ALJ found no evidence of side effects from treatment that would preclude Claimant from completing job duties on a regular and continuous basis. (*Id.*).

The ALJ also reviewed the medical source statements, which included testimony by Dr. Brendemuehl. Dr. Brendemuehl considered Claimant's complaints of pain and suggested postural and exertional limitations to account for those symptoms. The ALJ adopted Dr. Brendemuehl's opinions, even though they called for greater restrictions than suggested by two other agency consultants, Dr. Parikshak and Dr. Franyutti. The ALJ explained that when taking into account the clinical facts and Claimant's statements

of pain, Dr. Brendemuehl's opinions were entitled to greater weight. (Tr. at 22). The ALJ expressly recognized in the RFC finding that Claimant would experience chronic pain that would reduce his concentration and attention. (Tr. at 19).

Claimant criticizes the ALJ for failing to consider all of the factors set forth in 20 C.F.R. § 416.929(c) when evaluating the reliability of Claimant's statements of pain. This criticism is without merit, because the ALJ clearly considered the factors. He specifically discussed Claimant's medical evidence, daily activities, frequency of symptoms (chronic), aggravating factors, side effects of medications and treatments, measures taken by Claimant to alleviate pain, and medical source opinions. Although his discussion of each factor was not long, he actually was not obliged to mention all of them. Instead, he was only required to supply logical reasons grounded in substantial evidence to support the weight that he assigned to Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms. *See Bailey v. Colvin*, No. 5:14-cv-29435, 2015 WL 9595499, at *19 (S.D.W. Va. Dec. 4, 2015); *Murdock v. Colvin*, No. 5:14CV40, 2014 WL 9866441, at *3 (W.D.N.C. Nov. 19, 2014). Ultimately, the ALJ did just that.

When reviewing an ALJ's evaluation of a claimant's reported symptoms to determine if it is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these

questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The written decision supplies clear, concise, and supported reasons for the ALJ's determination that while Claimant had chronic pain, it was not disabling. Accordingly, there was no error in the pain and credibility assessment.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for judgment on the pleadings, (ECF No. 14), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall

constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 10, 2017

Cheryl A. Eifert
United States Magistrate Judge